The of the Court was delivered by
Tilghman C. J.
This case comes before us, on a rule to shew cause why two executions should not be set aside, and proceedings on the judgments staid, and issues directed order to ascertain the amount due to the plaintiff in each suit, On the 15th November, 1817, judgment was entered under *52 warrant of attorney, against the two defendants, Passmore and Birckhead,, for the penalty of g 10,000, in a bond, conditioned for the payment of g 5,000, in a year from the date of dle bond, with lawful interest. And on the same day, judgment was entered against Thomas Passmore, on his bond in the penalty of g 107,800 conditioned for payment of one-half that sum in a year from the date, with legal interest. It appears that by an agreement in writing, dated the 14th May, 1818, all matters in controversy between the plaintiff and Passmore and Birckhead, and also between the plaintiff and Thomas Passmore, were referred to George Latimer, George Thomas, and William. Sheepshanks, the award of whom, or any two of whom, was to be final and conclusive. On the 9th December, 1818, an award was made by all three of the referees, and on the 26(^h of the same month, executions were issued on both judgments for the sums awarded to the plaintiff. It was strongly contended on the part of the plaintiff, that the Court ought not to inquire into this award, unless it could be shewn, that the referees had acted corruptly, or partially, or had committed some palpable mistake in drawing up the award, such as a mis-calculation in the casting up of figures. How far the Court would go, in inquiring into the principles of an award made altogether at common law, it is unnecessary to decide ; because we do not consider this award, as entirely of that nature. ' It is true, that the submission was not made directly under a rule of Court. But it is equally true, that there were suits in Court, on which the award was to operate, and that executions were sued out, to carry it into effect. It has been the settled practice under the act of assembly of 1705, to inquire, to a certain extent, into the merits of awards made under rule of Court, and it may be supposed, that the parties in those suits entered into the references, under a belief that it should be subject to the general practice. This distinguishes the present case, from arbitrations where no action is depending, and justifies the Court in making the inquiry, whether the referees have made any plain mistake in matters of fact or law. As to matters of fact, where it appears that witnesses have been heard, and the fact decided by the referees, it is our general practice to inquire no farther, unless there should be something extraordinary in the case. Where the point, turns on the construction of writings, the Court considers the writings, and *53 corrects the error, if it appears that the referees have been mistaken. So also the error is corrected, if the .principles on which the award is founded, are contrary to law. The defendants have taken nine exceptions to the principles of this award, and one to the manner in which the proceedings were conducted, viz. that the witnesses were not sworn by any person having authority to administer an oath. I will first dispose of this last exception. The fact is, that the oaths were administered by the attornies of the plaintiff and defendants. This is easily accounted for. In arbitrations under what is called the compulsory act, the arbitrators have power to administer oaths, and the attornies are accustomed to do it, in their presence and under their authority. In the present instance, this was done, without reflecting, that the proceedings were not under the compulsory act. But as it was with the consent of both parties, who, if they pleased, might have had the witnesses examined without oath, it is no cause for setting aside the award. Had either party objected, it would have been different. I will now consider the objections to tbe merits of the award.
1. The dispute in this cause arises out of a contract between the parties, entered into about the 23d August, 1817, by which the defendants agreed to purchase of the plaintiff 177 bales of woollen cloths. The defendants allege, that in the plaintiff’s account, there was an overcharge of g 9,653 15 cts. on these cloths, but the referees decided against them. The agreement is in writing, and considering its magnitude, I have never seen one more loosely drawn. It bears no date,is signed with only the initial letters of the plaintiff’s name, and by the defendants not signed at all. As to the price, the words are these : — “ 100 advance on the length, 5 per cent, auction expenses off. Messrs. P. & B. to hand over the notes received for the sale, with their name on them, they having the privilege of discounting all the notes at the rate of 9 per cent, per annum. Notes to average 8 months.” And as to the goods sold, the expressions are as follows “ Messrs. P. & B. to take the Amity’s lots, together with the remainder of the P. M’s in the the old catalogue.” The parties' must have trusted much to mercantile good faith, when they made a contract which cannot be comprehended without parol explanation. It is to be understood, that P. M. ’s are cloths of a certain description, which the plaintiff had *54 purchased to a very large amount, fromJeremiah Thompson of New Tork, who got them from his brother William Thompson of England, who is supposed to have been his partner, and by whom they were manufactured. 57 bales of these cloths were at the time of the contract, in the store of the defendants, who were public licensed auctioneers in this city, and the remaining 120 bales were in the ship Amity, on the passage from England to New Tork. When the manufacturers in England sell their cloths, they do not charge for the actual length, but throw in 5 per cent, of length to the purchaser. In this contract, the defendants bought by the lengths, that- is, according to the actual length. So that the plaintiff, who had the advantage of this 5 per cent, reserved it to himself in his bargain with the defendants. There is no complaint on that point, but the defendants say, that in another very important particular, they were deceived. They bought, at 100 advance, that is, 200, currency for 100 sterling. It is essential, therefore, to ascertain what the sterling cost was, and therein, the defendants allege was the deception. When the contract was made, the plaintiff put into the hands of the defendants separate invoices, (called slips,) of each bale, wherein were mentioned the number of the bale, and a description, and the price of each piece of cloth contained in it. This, Mr. Passmore has sworn in his affidavit, whereon this motion was founded. He has also sworn, that some time after making the contract, he discovered, that the cloths imported in the Amity, were entered in the custom house, at New Tork, with a discount of. 10 per cent, on the prices contained in the invoices shewn to him; and therefore he complains, that he has been charged 10 per cent, more than the real sterling cost. We have examined the referees on this subject, who have informed us very fully, of the reasons which governed their decision. It appeared to them, that the defendants knew perfectly well what they were doing; they knew the quality of the cloths, and the exact price which they were to pay, because the invoices were shewn them. / Whether the invoices of the whole 177 bales were shewn, lhay be .doubtful, because the Amity had not arrived when the bargain was made. Perhaps Mr. Passmore may have been inaccurate in the expressions of his affidavit, and meant ?Q say, that the invoices of the 57 bales then in his store, were shewn to him. Be that as it may, the referees are satisfied, *55 that the cloths in the Amity, were of the same quality and price as the 57 bales in store, nor have the defendants even alleged the contrary. So that in fact the defendants were exactly informed of the quality and price of the goods. Another very material circumstance is, that the plaintiff purchased according to the invoices shewn to the defendants, without the deduction contained in the entry in the New York custom house. But how are we to account for that entry i Was the custom house defrauded by Jeremiah Thompson, the importer ? Undoubtedly, he must have satisfied the custom officers, that the real cost of the goods was 10 per cent, less than the invoice, but how he satisfied them, we are left to conjecture. There was no evidence on that subject, and two of the referees, (Mr. Thomas, and Mr. Sheepshanks,) made different conjectures, although they agreed in opinion, that it was immaterial, so far as concerned the defendants. These two gentlemen have considerable experience in English cloths, and the manner in which they are imported and invoiced. Mr. Thomas says, that the invoices are made out on the basis of 6 or 9 months credit, and that it is well understood, that in case of prompt payment 10 per cent, is deducted j and he considers the credited price as the fair invoice price, according to the usual course of business. The custom houses of New York and Philadelphia differ in this . point. An entry similar to that at New York would not have been permitted at Philadelphia, and the government has expressed its opinion, that the-Philadelphia construction was right. If Mr. Thomas is right in his conjecture, there was no fraud on the custom house or on the defendants. The invoices shewn to him, contained the fair prices, although the officers at New York were induced to strike off 10 per cent. It is to be observed, that this entry at New York, agreed exactly with the invoices shewn to the defendants, only that it was not so particular in describing the contents of each bale j but at the bottom of the columns, in which the prices stand and were cast up, was a deduction of about 10 per cent. Mr. Sheepshanks supposes, that William Thompson, being himself both manufacturer and exporter, struck off this 10 per cent, which was the manufacturer’s profit, in order that the goods might be entered at the actual cost to the manufacturer, but that they were sold to the plaintiff with the 10 per cent. on. It is absolutely impossible for the Court to as'cer *56 tain the truth of this matter. But when the referees, men of character, mercantile knowledge, and particular experience in this branch of commerce, are of opinion, that the defendants have been fairly dealt with, and have no claim to a deduction, how can we, without departing from all former precedents and principles, undertake to set aside the award ? Is this one of those pláin cases, where error is manifest ? Suppose even that we had doubts, are we therefore to undo the work of seven months inquiry and deliberation, (for the parties were seven months before the referees.) Would that be doing justice to a tribunal so convenient, and so deserving of encouragement? What man, in future, would voluntarily submit a' cause to arbitration, if he knew that after all his pains and trouble, it was to be entirely re-heard by the Court, and sent to the jury for decision, because it was not perfectly clear that all was right ? We have given the parties a very patient hearing, because the amount of property is considerable, and character is at stake. I cannot undertake to say, that the referees have been wrong in their decision, and therefore I am of opinion, that the first exception has not been supported.
The 2d, 3d, 4th, 5th, and 6th, exceptions, depend on the same principle. After making the original agreement, the plaintiff at the request of the defendants, advanced them a sum of money; in consideration of which, the defendants gave mortgages of real property, and pledges of personal property, in order to secure the whole amount due to the plaintiff; and it was agreed, that the plaintiff should be at liberty to proceed forthwith to the sale of the goods deposited in his hands, at the fair market prices, either by auction, or at private sale, and appropriate the proceeds to the discharge of his claim upon the defendants.’7 — The defendants complained, that sundry articles, mentioned in these five exceptions, were not sold at the fair market price. The referees enquired fully into this, and made the defendants a small allowance, but thought, that in general, no fault was to be found with the sales. The Court has seen nothing to the contrary. There is nothing therefore in these, excepting—
7. The 7th exception was simply a matter of fact, whether or no, the plaintiff had agreed to let the defendants have 8 20,000 for one year without interest. The referees decided against the defendants, and we cannot say they were *57 wrong; this exception indeed was relinquished in the argument.
8. The 8th exception turns on the construction of a writing, and there we can judge with certainty. I have already mentioned, that subsequent to the original agreement, the plaintiff advanced money to the defendants, in consequence of which, he received a mortgage of real estate, and a pledge of goods. He had besides, undertaken to procure a discount for the defendants of 60,000 in notes of Edward Thompson. For these considerations, it was agreed by writing, dated 20th November, 1817, as follows, “ John Large is to have a commission of 21 per cent., on all the property placed by us in his hands, as well as Mr. Thompson’s notes of % 60,000, leaving out the amount of our notes for about $ 37,000, if the same are paid, as they become due.” The referees were of opinion, that inasmuch as these notes amounting to $ 37,000 were not punctually paid, the plaintiff was entitled to a commission of 2-| per cent., on them; The defendants are willing to pay the commission of 2|- per cent., on all the goods which were pledged to the plaintiff with power to sell; but complain of being obliged to pay a commission on their own notes, which they say they never intended, and which they allege, would amount to usury. Any attempt to cover a premium of more than 6 per cent, for the use of money, would be fruitless. To call it a commission, would not' alter its nature. When a commission is spoken of, it implies some thing to be done, on which a commission would arise, because it is no more than a compensation for hazard or business. Where there has been a loan of money, it is so easy to cloak usurious interest under the name of commissions, that the law contemplates it with a jealous eye. In the case of French v. Baron, 2 Atk. 120, there was a private agreement between mortgagor and mortgagee, that the latter should have a commission for his trouble in receiving the rents and profits. This might not be usury, strictly speaking, but Lord Hardwicke refused to allow the mortgagor any thing more than his principal and interest. This was going very far, but it shews the watchful eye which that great chancellor kept upon loans of money where more than legal interest was to be got. Now, in the present case, I can perceive that there might be trouble in converting goods into money, and hazard in the discounting of *58 notes; a commission therefore on the goods, and on Thompson’s notes, might be proper. But it is not so easy to discover, why the defendants should pay a commission on their own notes> even though they were not punctually paid. I have therefore scrutinized this writing of the 20th November, 1817, with a view of discovering whether it was really the intent to charge a commission on the $ 37,000. The first thing which strikes me is, that it is not said that such commission shall be paid. The expressions are leaving out the amount of those notes, if not paid when due. What is meant by leaving out ? To understand it, you must connect it with what goes before, and with that connection, it may be understood, that the plaintiff shall have a commission on Thompson?s notes, and the proceeds of the goods pledged, deducting therefrom the g 37,000 notes, if punctually paid; but if not, then on the whole amount of notes and goods, leaving out, or not deducting the g 37,000. It is to be remembered, that the goods pledged to the plaintiff were a security for these g 37,000, as well as the rest of his debts ; and as to the real estate, the plaintiff had no power to sell it. It could only be sold by a suit on the mortgage, and in that case, the sheriff, who sold, and not the plaintiff, would be entitled to a commission. The construction which I have mentioned, will give something for a commission to operate on, and therefore, although I am not certain it was really so intended, yet I prefer it to one which would bring the contract so near the line of usury, that it would be difficult to distinguish it. But even supposing the plaintiff’s construction to be right; that it was intended the commission should be paid; and granting that, in strictness, it is not usury ; yet, if no service was to be done, without doubt Lord Rardwicke would not have permitted the plaintiff to take the commission. I am therefore of opinion, that it should not be allowed.
9. The 9th exception is of little importance, and seems to have escaped the attention of the referees. The defendants complain of the allowance of g 59 46 cts. commission on part of Edward Thompson's notes, on which the plaintiff did not procure the money for the defendants. If that was the case, the commission should not be allowed; and indeed, Mr. Sheepshanks seems to think, that on this small article, the referees did not act with sufficient deliberation. I am therefore of opinion that it should be struck out. It is for the *59 plaintiff to say, whether he will submit to take the award, with these two charges of commissions struck out. If he will, it is the opinion of the Court, that the award should stand 5 if not, that it should be set aside.